Larry M. JENSEN, Defendant-Appellant,

v.

STATE of Delaware, Plaintiff-Appellee.

Supreme Court of Delaware.

Submitted: Jan. 9, 1984.

Decided: Sept. 11, 1984.

Carl Schnee (argued) of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for defendant-appellant.

Ferris W. Wharton (argued), Deputy Atty. Gen., Wilmington, for plaintiff-appellee.

Before HORSEY, MOORE and CHRISTIE, JJ.

HORSEY, J.

Defendant, Larry M. Jensen, seeks reversal of his convictions in a jury trial of Rape in the First Degree (11 *Del.C.* § 764), Conspiracy in the First Degree (11 *Del.C.* § 513(1)), Possession of a Deadly Weapon during the Commission of a Felony (11 *Del.C.* § 1447(a)), and Robbery in the First Degree (11 *Del.C.* § 832). Defendant received a sentence of life imprisonment on the rape charge, three years imprisonment on the robbery charge and five years imprisonment on the weapons offense, sentences to run consecutively. On appeal, defendant asserts multiple grounds for reversal. We find no reversible error and therefore affirm.

I

On October 29, 1981, the victim left her home to go on a "date" with the defendant's brother-in-law. After leaving the victim's house, the couple stopped to visit briefly with certain of the date's friends. At one such stop, her date telephoned the defendant to request a "loan" for the evening. A rendezvous was arranged.

Shortly thereafter, the couple drove to a local convenience store where the defendant was waiting with the solicited cash. The victim and the defendant were then introduced and a brief exchange followed. The victim left her date and defendant for a few minutes to make a purchase in the store. Upon her return, the victim noticed her date with road map in hand talking with defendant and pointing to an unknown location on the map. Victim and her date then returned to his car and drove off.

Victim's date drove them to a secluded area. There they parked the car, locked the doors and walked to a nearby hill. The couple then engaged in sexual intercourse and within an hour returned to the car. The date testified that the car doors were still locked. But he also testified that defendant had keys to the car, the defendant having sold the vehicle to the date two to three months earlier.

Thereafter, as the couple prepared to drive off, the victim felt someone reach from behind the back seat, put a hand across her mouth and place a gun to the right side of her neck. Threatening to harm the victim if she screamed, the assailant then demanded the couple's money. After taking the surrendered cash, the attacker asked the victim whether she "let Jim fool around" with her. According to the victim, this was the first mention of any of the parties' names.

The assailant then ordered the couple to have intercourse. As they were unable to do so, the attacker, again referring to the date by the name of Jim, allegedly stated that he would complete the act since the date could not. The assailant then raped the victim.

When the attacker had left, the couple went to a neighbor's home to telephone the police. Upon the arrival of a state patrol-

man, the victim recounted the evening's events, including a description of her attacker's height, weight and age. When asked his race, the victim said she thought her assailant was either Puerto Rican or Black due to his dark hands and "unusual accent." But the victim also indicated that the rapist had masked his face with a nylon stocking and was wearing dark men's work pants and a tan-colored jacket. Later the victim remembered that the assailant had pointed his revolver at only her.

Two weeks following the attack, the victim was again interviewed by the police. At the second interview, she concluded that her assailant was "very similar" to the defendant. Her conclusion was based upon two later recollections: (1) of being introduced to defendant at the convenience store; and (2) of her view of the lower portion of her assailant's face in the brief interval before the attack when he raised the stocking mask. The victim testified that her attacker's mustache, the part in his hair and his chin resembled that of the defendant's. The victim further stated that the assailant's voice was comparable to the defendant's with the exception that the suspect attempted to disguise his voice by assuming a foreign accent. The defendant was arrested on November 25, 1982 on the basis of this description.

## II

Following defendant's arrest, the police obtained and executed three search warrants issued for defendant's person, dwelling and automobile. The fruits of the search included a .22 caliber hand weapon, a stocking, a pair of blue pants, a pair of green pants, a shopping bag and a Delaware road map. Defendant contests the admissibility of the evidence.

### A.

It is first alleged that the affidavits upon which the warrants were issued failed to set forth sufficient probable cause to identify the defendant as the victim's assailant. The affidavit for the search warrants con-

tained the following allegations: (a) that the suspect was "a white male, approximately 20 years old, 5′ 6″, 140 lbs., wearing green work pants, a tan colored jacket and a stocking mask"; (b) that the defendant is "a white male, date of birth October 27, 1956, 5′ 6″, 130 lbs., black hair with a bushy mustache"; (c) that defendant is the brother-in-law of the victim's date; and (d) that the victim indicated "that [defendant's] physical and facial appearance are the same as her attacker's, and the voice was very similar with the exception that the suspect attempted to disguise his voice by stuttering his words." Defendant contends that the foregoing identification was insufficient to support a reasonable belief that he was the perpetrator of the rape. We find probable cause for issuance of the warrant.

■ A search warrant will not issue "unless there be probable cause supported by oath or affirmation." *Del. Const.* Art. I, § 6. Section 2306 of Title 11 of the Delaware Code prescribes the requirements necessary to the establishment of constitutionally sufficient probable cause:

The application or complaint for a search warrant shall be in writing, signed by the complainant and verified by his oath or affirmation. It shall designate the house, place, conveyance or person to be searched and the owner or occupant thereof (if any), and shall describe the things or persons sought as particularly as may be, and shall substantially allege the cause for which the search is made or the offense committed by or in relation to the persons or things searched for, and shall state that the complainant suspects that such persons or things are concealed in the house, place, conveyance or person designated and shall recite the facts upon which such suspicion is founded.

Thus, the affidavit in support of a search warrant must set forth facts adequate to warrant a reasonable man in the belief that an offense has been committed and that seizable property would be found in a par-

ticular place or on a particular person. 11 *Del.C.* § 2306; *Edwards v. State*, Del. Supr., 320 A.2d 701, 703 (1974); *Wilson v. State*, Del.Supr., 314 A.2d 905, 906–07 (1973).

In addition, the alleged facts must be such "as to allow the magistrate to make an independent evaluation of the matter." *Franks v. Delaware*, 438 U.S. 154, 165, 98 S.Ct. 2674, 2681, 57 L.Ed.2d 667 (1978). A determination of probable cause by the issuing magistrate will be paid great deference by a reviewing court and will not be invalidated by a hypertechnical, rather than a common sense, interpretation of the warrant affidavit. *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965). *See* 11 *Del.C.* § 2307;[1] *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969); *Pierson v. State*, Del.Supr., 338 A.2d 571, 573–74 (1975); *Edwards v. State*, 320 A.2d at 703; *Wilson v. State*, 314 A.2d at 906–07. The affidavit will be considered as a whole and not on the basis of its separate allegations. *Dunfee v. State*, Del. Supr., 346 A.2d 173, 175 (1975); *Edwards v. State, supra* at 703; *Rossitto v. State*, Del.Supr., 234 A.2d 438 (1967).

Clearly the affidavit here connected the defendant to the victim's rape. Excepting a ten-pound variance in weight and a five-year discrepancy in age, the descriptions of the suspected attacker and the defendant were identical. Moreover, the affidavit alleged: (a) that the defendant and his brother-in-law had earlier been observed reviewing a road map; (b) that the assailant referred to the date by name; (c) that the attacker pointed the weapon at the victim exclusively; and (d) that the victim had observed, with some limitation, the facial features of both the defendant and the assailant. Thus, applying a common sense interpretation to the affidavit, we conclude that sufficient facts are alleged so as to create a reasonable suspicion that the defendant committed the rape and that the items sought would be found in the locations noted. *See Edwards v. State, supra; Wilson v. State, supra.* Defendant's attack on the sufficiency of the application to establish probable cause is therefore without merit.

**B.**

Defendant next contends that the information supporting the warrant affidavit was stale and otherwise failed to satisfy the requirements of 11 *Del.C.* § 2306.

The law is well settled that probable cause to justify the issuance of a warrant must be manifest at the time the warrant is sought to make the search. *Sgro v. United States*, 287 U.S. 206, 53 S.Ct. 138, 77 L.Ed. 260 (1932). It is not sufficient that at some prior time there existed circumstances that would have warranted the search in question. *United States v. Steeves*, 8th Cir., 525 F.2d 33, 37–38 (1975); *Pierson v. State*, Del.Supr., 338 A.2d 571, 573 (1975). Whether the proof meets the test of temporal proximity is determined on an *ad hoc* basis in light of the circumstances of each case. *Sgro v. United States, supra*, 287 U.S. at 211, 53 S.Ct. at 140; *United States v. Harris*, 3rd Cir., 482 F.2d 1115, 1119 (1973); *State v. Pulgini*, Del. Supr., 374 A.2d 822, 823 (1977).

The question of the staleness of probable cause rests primarily upon the nature of the criminal activity alleged in the affirmation accompanying the warrant. *United States v. Harris, supra.* Statements of dates and times, while instructive, are not dispositive to the ascertainment of the validity of probable cause. *Id.* at 1119 (*citing United States v. Johnson*, 10th Cir., 461 F.2d 285, 287 (1972)). *See United States v. Steeves, supra.* Other factors to

---

1. 11 *Del.C.* § 2307 provides in part:
 § 2307. *Issuance of a search warrant; contents.*
 "If the judge, justice of the peace or other magistrate finds that the facts recited in the complaint constitute probable cause for the search, he may direct a warrant to any proper officer or to any other person by name for service...."

be considered include the kind of property for which authority to search is sought and whether such evidence is highly incriminating or consumable and thus less likely to remain in one location. *United States v. Beltempo,* 2nd Cir., 675 F.2d 472, 478 (1982); *United States v. Steeves,* 525 F.2d at 38. Certainly the "validity of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts relied upon and the issuing of the affidavit." *United States v. Johnson,* 461 F.2d at 287. Hence, whether information has become stale due to an impermissible delay in securing a warrant depends upon all the facts as viewed in a flexible and practical manner. *United States v. Beltempo,* 675 F.2d at 478; *Carter v. State,* Del.Supr., 418 A.2d 989, 992 (1980).

Defendant argues that the warrant application was fatally defective in that it failed to state either when the information was received or when the incident or facts as alleged occurred. Defendant also attacks the validity of the warrant on the basis of a 27-day lapse between the date of the victim's attack and the time the State applied for a warrant. Defendant claims that this delay, coupled with the isolated nature of the incident, vitiates a finding of probable cause.

 On the record before us, we cannot say that the failure of the affidavit to state expressly when the information was acquired precluded a finding of probable cause by the issuing magistrate. It is enough that the affiant provided the date of the occurrence and thereafter presented the events in a logical sequence. The test for probable cause is much less rigorous than that governing the admission of evidence at trial and requires only that a probability, and not a prima facie showing, of criminal activity be established. *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (*citing Beck*

*v. Ohio,* 379 U.S. 89, 96, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964)).

 We also cannot agree that the lapse of 27 days was so great as to invalidate the warrant as a matter of law. The evidence here included a nylon stocking, a revolver, various articles of men's clothing, a road map and body hair from the defendant. It is clear that these items are not incriminating in themselves and each is of a type normally found on one's person or in one's home or automobile. Given the nature of this property, the delay between the offense and the issuance of the warrants did not render the information therein stale or otherwise insufficient under 11 *Del.C.* § 2306. The magistrate could reasonably have concluded that the specified items were presently in the places to be searched. *Sgro v. United States,* 287 U.S. at 210, 53 S.Ct. at 140; *Pierson v. State,* 338 A.2d at 573; *Edwards v. State,* 320 A.2d at 703.

### C.

Defendant's third argument for suppression is that the warrants failed to aver facts necessary to sanction a search of his home and vehicle at night and, in the alternative, that the "authority" for such search, as required by 11 *Del.C.* § 2308, was not expressly set forth in the warrants.

Section 2308 provides:

A search warrant shall not authorize the person executing it to search any dwelling house in the nighttime unless the judge, justice of the peace or magistrate is satisfied that it is necessary in order to prevent the escape or removal of the person or thing to be searched for, and then the authority shall be expressly given in the warrant.[2]

 It is evident from this language that a warrant will not issue for a nighttime search unless the judicial officer is content that such is "necessary" to prevent

---

**2.** By amendment effective June 30, 1982, 11 *Del.C.* § 2308 added the following sentence: "For purposes of this section the term 'night-time' shall mean the period of time between 10:00 p.m. and 6:00 a.m." 63 Del.Laws, c. 308 (1982).

the removal or destruction of potentially incriminating evidence. In *Henry v. State*, Del.Supr., 373 A.2d 575 (1977), this Court enunciated the standard for reviewing the authorization of a § 2308 search:

[T]he "four-corners" test [for probable cause] is likewise applicable to the determination of whether a warrant may authorize a search at nighttime under § 2308. In other words, sufficient facts showing that a nighttime search is necessary to prevent the escape or removal of the person or thing to be searched must appear on the *face of the affidavit* before such a search may be authorized. Only in this way can a reviewing court verify existence of the statutory requirements.

*Id.* at 577 (emphasis added).

The affidavits in question certainly satisfy the showing of "necessity" mandated by § 2308. In its request to search the defendant's apartment and truck at night, the State submitted that since the defendant was presently in police custody and therefore aware of police involvement in the incident, he likely would *seek to remove or destroy any evidence* linking him to the crime. The articulated concern for the preservation of evidence for trial distinguishes this case from *Henry* wherein this Court invalidated a warrant for failure of the affidavit to particularize the necessity for a nighttime search. In light of this distinction, we find the State's application to have provided the magistrate with adequate grounds for authorizing, under § 2308, the more intrusive search of defendant's apartment at night. With respect to the nighttime search of defendant's truck, we uphold the issuance of the warrants on the basis of defendant's lesser expectation of privacy in his automobile and the reasonableness of the intrusion under the Fourth Amendment.

We also find unpersuasive defendant's contention that the warrant contained no "authority" for the search. The warrant stated: "A search in the nighttime is expressly authorized for the reasons set forth in the affidavit attached hereto." In applying the holding of *Henry*, we must consider this reference to the affidavits together with the allegations contained therein. Since the affidavits indicated a potential for the destruction or removal of evidence, there is no doubt but that the State established a proper factual predicate for its request for a nighttime search. The requirements of § 2308 have been fulfilled.

### D.

Defendant finally argues that the inclusion in the warrant affidavits of inaccurate factual statements which were made knowingly or in reckless disregard for the truth and which were material to a finding of probable cause necessitates suppression of all evidence seized pursuant to the warrants. *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

In *Franks*, the United States Supreme Court announced a two-part test for the determination of whether the veracity of a warrant affidavit may be challenged in a post-search evidentiary hearing. The Court summarized as follows:

There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any non-

governmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. (footnote omitted). On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue. 438 U.S. at 171–72, 98 S.Ct. at 2684–85. *Compare United States v. Leon,* ── U.S. ──, ──, ──, ──, 104 S.Ct. 3405 at, 3413, 3417, 3422, 82 L.Ed.2d 677 (1984).

Defendant's *Franks* challenge is premised upon two sworn statements which allegedly were crucial to a finding of probable cause. In substance, the affirmations reflect the victim's determination that her attacker resembled the defendant and her recollection of the subject's directing the weapon at her only and otherwise appearing to know the victim's date.[3] Defendant attacks the veracity of the first statement by noting the discrepancy in the victim's initial description of the rapist as a Puerto Rican or a black male with a heavier build and her subsequent conclusion that her assailant was "very similar" to the defendant. As to the second allegation, defendant relies on the date's testimony at trial that the victim, rather than the suspect, first called the date by name.

 We find defendant's argument wholly without merit. First, in *Franks,* the Supreme Court expressly limited its holding to statements made deliberately or with reckless disregard for the truth by the *affiant.* Second, the Court required only that the affidavit "be 'truthful' in the sense that the information put forth is believed

or appropriately accepted by the affiant as true." 438 U.S. at 165, 98 S.Ct. at 2681.

 In this case the affiant, a member of the Delaware State Police, merely transcribed that which was related to him by the victim either at the time of the incident or two weeks later. There is no indication in the record that the affiant either disbelieved the victim's statements or should not have accepted them as being truthful representations of the facts as the victim knew them. Defendant has not submitted supplemental affidavits supporting a contrary finding, hence, he has failed to overcome the presumption of veracity. Absent a finding of deliberate misrepresentation, we do not reach the question of the insufficiency of probable cause upon the deletion of the challenged allegations.

### III

Next defendant contends that the elicitation of his pre-arrest and post-*Miranda* silence as well as his pre-arrest and post-*Miranda* retention of counsel during cross-examination of defendant constituted an impermissible comment on defendant's exercise of his constitutional rights in violation of the Fifth and Sixth Amendments as applied to the states through the Fourteenth Amendment.

During the cross-examination, the prosecution questioned the defendant as to his actions from the time he learned he was a suspect in the case until the time of his subsequent arrest:

Q: When did you find out that the police were looking at you as a suspect?

A: He had mentioned it to me, I'd say, approximately a week before I was arrested, that he had said, you know, they were looking for me. And that's

---

3. The specific allegations are as follows:
 1. "Your affiant can state that the victim stated that [defendant's] physical and facial appearance are the same as her attacker's and the voice was very similar with the exception that the suspect attempted to disguise his voice by stuttering his words."

2. "The victim stated that through the whole ordeal the suspect never pointed the weapon at [the date] and acted as though they knew each other. The suspect addressed [the date] as 'Jim' even though no one advised [of the date's] first name."

—it was kind of vague in my mind. I didn't know too much more on it.

Q: Were you interested in finding out what—

A: Yes, I was interested in—like a lot of things. It's hard to believe half the things he's told. A lot of times he's told me one thing—

Q: If you'd answer the question, were you interested in finding out whether they were or not?

A: Not definitely, no.

Q: You weren't too interested?

A: I was concerned.

Q: Did you ask him how he knew that they were looking into you?

A: I had inquired into that, you know.

Q: From [the date]?

A: Right.

Q: Did you ever contact the police to find out why they were doing that?

A: When [the date] informed me that they would be looking for me, I hired my attorney, just as a precaution. He advised me that I should contact the police and go in and talk to them about what they wanted to know.

Q: Did you do that?

A: The evening that I was going to call them and talk to them was the evening I got arrested.

Q: So you were all set to go in and talk to them, but you got arrested instead?

A: Right. I came home from work and I was going to go in and talk to Detective Baxter and that's the night he confronted me outside the apartments.

Q: Did you talk to him?

A: At the point that I found out he read my rights and what I was accused of, I told him I wanted to talk to my attorney.

Defendant answered all questions without objection and no further comment was made concerning defendant's exercise of his right to remain silent or his right to retain an attorney. Defense counsel did not request curative instructions on the subject. Defendant now claims "plain error" in the Trial Judge's failure to *sua sponte* strike this examination from the record.

The Fifth Amendment guarantees an accused the right to remain silent during his criminal trial and prevents the prosecutor from commenting on the silence of a defendant who asserts the right. *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). However, "[t]he immunity from giving testimony is one which the defendant may waive by offering himself as a witness.... When he takes the stand in his own behalf, he does so as any other witness, and within the limits of the appropriate rules he may be cross-examined...." *Raffel v. United States*, 271 U.S. 494, 496–97, 46 S.Ct. 566, 567–68, 70 L.Ed. 1054 (1926).

In determining the scope of the Fifth Amendment protection, the United States Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), held that the Fifth Amendment requires that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retain or appoint counsel before submitting to interrogation. After *Miranda*, the Supreme Court decided in *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) that a state prosecutor could not impeach a defendant's exculpatory story, brought out for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving his *Miranda* warning:

[W]hile it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warning. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be

used to impeach an explanation subsequently offered at trial. 426 U.S. at 618, 96 S.Ct. at 2245.

In *Fletcher v. Weir,* 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982), however, the Supreme Court refused to apply *Doyle* to a defendant who was unable to prove that he had received any *Miranda* warnings during the period in which he remained silent following his arrest. The Court there stated:

> In the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to post-arrest silence when a defendant chooses to take the stand. A State is entitled, in such situations, to leave to the judge and jury under its own rules of evidence the resolution of the extent to which post-arrest silence may be deemed to impeach a criminal defendant's own testimony.

455 U.S. at 607, 102 S.Ct. at 1312.

In *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), the Court addressed the issue of pre-arrest silence. In *Jenkins,* the defendant was charged with First Degree Murder. At trial, defendant testified that he killed in self-defense. During cross-examination, the defendant was asked about his actions after the killing. Defendant testified that he had waited two weeks before surrendering to the authorities and that he had not attempted to contact the police during that period. The prosecutor made reference to defendant's pre-arrest silence in his summation to the jury.

The Court held that the Fifth Amendment was not violated by the use of defendant's pre-arrest silence for impeachment purposes since the "impeachment follows the defendant's own decision to cast aside his cloak of silence and advances the truth-finding function of the criminal trial." 447 U.S. at 238, 100 S.Ct. at 2129. Determining *Doyle* to be inapplicable due to the want of governmental inducement of silence, the Court also found no violation of the fundamental fairness guaranteed by the Fourteenth Amendment. *Id.* at 239–41, 100 S.Ct. at 2129–31.

The prosecutor's questions during cross-examination of defendant concerning his actions prior to his arrest were not impermissible as a matter of law. With the exception of the final question, each inquiry arguably focused on defendant's pre-arrest, pre-*Miranda* conduct only. Therefore, in light of the Supreme Court's direction in *Jenkins,* we cannot say that the Trial Court committed legal error in permitting the defendant's testimony. This Court has recognized counsel's wide discretion on cross-examination, *Thompson v. State,* Del.Supr., 399 A.2d 194, 202 (1979); *Martin v. State,* Del.Supr., 346 A.2d 158, 160 (1975), as well as the Trial Court's discretionary authority in ruling upon the extent of such questioning. We will not disturb rulings by the Trial Judge absent a clear abuse of that discretion, *Thompson v. State, supra.* We find no such abuse on the record before us.

We also conclude that the Supreme Court's rationale in *Jenkins* disposes of defendant's Sixth Amendment pre-arrest argument. In so doing, we agree with the statement by the Court of Appeals for the Third Circuit that for the purpose of a "penalty" analysis, no distinction should be made between the privilege against self-incrimination and defendant's right to counsel. *United States ex rel. Macon v. Yeager,* 3rd Cir., 476 F.2d 613, 615 (1973), *cert. denied,* 414 U.S. 855, 94 S.Ct. 154, 38 L.Ed.2d 104 (1973).

We are also satisfied that the Trial Court did not commit reversible error in failing to strike the prosecutor's question eliciting defendant's post-*Miranda* silence and retention of counsel. Although the State may not penalize a defendant for the exercise of any constitutional right, *United States ex rel. Macon v. Yeager, supra,* every reference to an accused's invocation of a right does not mandate reversal. *Shantz v. State,* Del.Supr., 344 A.2d

245 (1975). Here, the defendant volunteered information beyond the scope of the prosecutor's question, no objection was raised by defense counsel, questioning was immediately terminated, and no reference was made to the post-*Miranda* conduct in summation. Any error resulting from defendant's response was harmless beyond a reasonable doubt.

## IV

Defendant next asserts that:

(1) The Trial Court erred in refusing to allow the opinion testimony of a clinical psychologist concerning the veracity of the date's testimony at trial. The testimony of the date and the examining psychologist revealed: (a) the date's prior criminal background; (b) his extensive history of alcohol and drug abuse; (c) his overall state of depression, anxiety and fear; (d) his three attempts at suicide; (e) his limited intelligence; and (f) his voluntary and involuntary commitments to at least two separate mental institutions. On direct examination of the psychologist, defense counsel asked:

> ... under circumstances where [the date] faced possible life imprisonment and could reduce substantially his possible imprisonment by making a statement implicating another, what do you feel the reliability of that statement would be?

Defendant sought to establish that since the date's testimony was the only direct evidence of defendant's involvement in the rape, "any reasonable aid to the jury in assessing the validity of the testimony of the State's most important witness should have been utilized at trial." The Trial Court excluded the testimony, stating: "It's also in a hypothetical sense which is not accurate under the facts."

The admission of testimony is within the sound discretion of the Trial Judge and will not be reversed on appeal absent a clear showing of an abuse. We cannot say that the exclusion here constituted an abuse requiring reversal.

(2) The Trial Court erred in allowing the testimony of two rebuttal witnesses called by the State. Defendant contends that the testimony elicited from the witnesses was not proper rebuttal in that it did not rebut evidence presented in defendant's case and, more importantly, it implied to the jury that defendant was guilty of two unrelated crimes. The State responds that the proffered testimony rebutted either prior character testimony offered by two defense witnesses or direct statements made by the defendant. Upon review of the record, we believe the testimony to have been proper rebuttal. We find no abuse by the Trial Judge in admitting this evidence.

(3) The prosecutor's comments in summation constituted reversible error. Defendant contends that the prosecutor's remarks concerning the date's sentence and the defendant's character were improper and inaccurate, thus prejudicially affecting defendant's substantial rights.

In summation, the prosecutor stated:
[The date] put his money where his mouth was so to speak. Sure, he has admitted his guilt and he has not just come in here and said "I'm guilty. I'm going to walk away." He paid a price for admitting that guilt. He hasn't been sentenced yet and a judge of the Superior Court will sentence him. And he is getting a long time in jail. And he doesn't have any control over that at all, no matter what he came in here and said.

The summation was based upon the date's testimony on direct and cross-examination.[4]

4. Q. Have you been sentenced yet?
 A. No, I haven't.
 Q. Do you understand that you could go to jail?
 A. Yes, I do.

Q. Apart from telling the truth today, does your testimony have any bearing on your sentence?
A. Pardon?
Q. Let me strike that. Have I made any promises to you about what your sentence will be?

In defendant's summation to the jury, counsel stated: "[The date] is going to the real jail this time, not to some sort of stricter boys camp. He's going to the real place this time and he knows it." No objection was raised as to any of the foregoing comments.

Upon this record, we believe the prosecutor's erroneous statement regarding the date's possible sentence did not constitute plain or fundamental error. In the context of the entire trial and the date's own testimony that his sentence was uncertain, we cannot say that one unchallenged comment requires reversal.

◼ With respect to the prosecutor's characterization of the defendant as a "fraud", we note our holding in *Hughes v. State*, Del.Supr., 437 A.2d 559, 571 (1981):

Striking the balance between permissible and impermissible comment by a prosecutor, calls for the exercise of a sound discretion by the Trial Judge. Cf. [*United States v.*] *LeFevre* [3rd Cir.], 483 F.2d [477] at 479 [ (1973) ]. In exercising that discretion, the Trial Judge must prohibit a prosecutor from calling the testimony or statement of a witness or party as a "lie" unless, (a) that is a legitimate inference which may be drawn from the evidence, and (b) the prosecutor relates his argument to specific evidence which tends to show that the testimony or statement is a lie.

\* \* \* \* \* \*

In reviewing charges of prosecutorial misconduct based on the impermissive use of the epithet "lie" or "liar", we consider whether the remark "prejudi-

cially affect[ed the] substantial rights of the accused." *Sexton* [*v. State*, Del. Supr.], 397 A.2d [540] at 544 [ (1979) ]. For that purpose we adopt the standard recently formulated in *Dyson v. United States*, D.C.App., 418 A.2d 127, 132 (1980), thus:

"The decisive factors are the closeness of the case, the centrality of the issue affected by the [alleged] error, and the steps taken to mitigate the effects of the error."

In our opinion, the prosecutor's remark was a legitimate inference to be drawn from prior rebuttal testimony and did not prejudicially affect defendant's substantial rights. The case was not founded on circumstantial evidence. Indeed, evidence of defendant's guilt was overwhelming. We also cannot say, based on the entire record, that the issue of defendant's credibility was substantially affected by the prosecutor's comment.

### V

Next defendant argues that the Trial Court committed reversible error in failing to record during the course of trial nineteen sidebar conferences, thus denying defendant his right to a record complete for appellate review. The State claims the failure to report the conferences in no way impinged upon defendant's substantial rights. We agree.

◼ It is generally established that a showing of prejudice is required for a finding of reversible error in the omission of any portion of criminal proceedings. *Ste-*

A. No, you haven't.
Q. Has Mr. Hillis made any promises to you about what your sentence will be?
A. No, he hasn't.
Q. Has any judge made any promises to you about what your sentence will be?
A. No.

\* \* \* \* \* \*

Q. Did you know the possible sentence for the charges that you were arrested for that night?
A. I know it was around 80 years.
Q. About 80 years?

(Witness nodded his head).
Q. Do you know what the possible sentence is for the charge you pled guilty to?
A. Ten.
Q. Ten. Is there a minimum?
A. I don't know if there is a minimum?
Q. Do you know if there was a minimum for the charges that you were charged with if you were convicted, if you were convicted of rape and all that? Do you know if there was a minimum?
A. I don't know what the minimum was. I just know I was facing 80 years.

*phens v. Zant,* 5th Cir., 631 F.2d 397 (1980), *rev'd on other grounds,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *Edwards v. United States,* 10th Cir., 374 F.2d 24 (1966), *cert. denied,* 389 U.S. 850, 88 S.Ct. 48, 19 L.Ed.2d 120 (1967); *Stirone v. United States,* 3rd Cir., 341 F.2d 253 (1965), *cert. denied,* 381 U.S. 902, 85 S.Ct. 1446, 14 L.Ed.2d 284 (1965). In *Bailey v. State,* Del.Supr., 440 A.2d 997 (1982), this Court commented, in a footnote to the decision, upon the Trial Court's failure to report one sidebar conference during trial:

> The absence of a complete record of all pertinent exchange between a Trial Court and counsel is particularly distressing in a case of this magnitude and is not unlikely to constitute reversible error in a foreseeable situation. *See State v. White,* Del.Supr., 395 A.2d 1082, 1095 (1978).

440 A.2d at 1000.[5] On the strength of the *Bailey* footnote, defendant claims that *nineteen* unreported sidebar discussions mandate reversal.

In our recent decision in *Ross v. State,* Del.Supr., 482 A.2d 727, Horsey, J. (1984), we declined to adopt a *per se* rule for reversal, concluding instead that:

> We follow the weight of authority that prejudice must be shown, or perceived, to have resulted from the failure to record a portion of a trial proceeding for reversible error to be found. (footnote and citations omitted).

At 734–735.

 Upon our review of the record, we are satisfied that the omissions did not result in prejudice to defendant's substantial rights. Defendant concedes that eight of the nineteen conferences dealt "only with scheduling matters." As to the remaining discussions, we find either: (a) that no change occurred in the line of questioning following the sidebar; (b) that the record is sufficient to indicate the substance of the sidebar; or (c) that the record discloses no showing of prejudice sufficient to require reversal as a matter of law. Therefore, defendant's argument for reversal based on an incomplete record must fail.

## VI

 Defendant finally contends that the Court's denial of his motion for a new trial on the ground that the verdict was against the weight of the evidence constituted an abuse of discretion. The test to be applied is "whether the evidence [be it direct or circumstantial], viewed in its entirety and including all reasonable inferences, is sufficient to enable a jury to find that the State's charge has been established beyond a reasonable doubt." *Holden v. State,* Del.Supr., 305 A.2d 320, 322 (1973). The record here amply supports the verdict entered against the defendant.

\* \* \*

Affirmed.

---

**5.** Unlike the Federal Court Reporter's Act, 28 U.S.C. § 753(b), which mandates the reporting of all proceedings, Delaware's statute, 10 *Del.C.* § 525, requires the recording of "... all evidence, opinions and other matters as the Superior Court *may* require...." (emphasis added).