# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| **STATE OF DELAWARE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **I.D.: 2308011956** |
| v. | ) | |
| | ) | |
| **DWAYNE BRITT,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**Submitted:** October 10, 2024
**Decided:** October 16, 2024

## <u>OPINION AND ORDER</u>

*Upon Consideration of Defendant's Motion to Suppress*

## DENIED

*Brett Fallon, Esquire*, Deputy Attorney General, Delaware Department of Justice, 820 N. French Street, 7th Floor, Wilmington, Delaware, *Attorney for the State.*

*John S. Malik, Esquire*, 100 East 14th Street, Wilmington, Delaware, *Attorney for the Defendant.*

**JONES, J.**

# INTRODUCTION

This is the Court's decision on a Motion to Suppress evidence seized during the search of Dwayne Britt's ("Britt" or "Defendant") residence at 1406 West 6th Street, Wilmington, Delaware. Following the search, Britt was indicted on Drug Dealing, Drug Possession, two (2) counts of Possession or Control of a Firearm by a Person Prohibited, Possession or Control of Ammunition by a Person Prohibited, and Possession of Drug Paraphernalia.

The search was conducted incident to a warrant. Britt submits that the evidence found in his residence should be suppressed because the affidavit in support of the search warrant lacked probable cause to support a search of 1406 West 6th Street, and there was no logical connection or nexus between the items sought and Britt's home. Therefore, Britt claims that the search of his residence violated his rights under the Fourth Amendment to the United States Constitution and Article I, §6 of the Delaware Constitution.

The state counters that the warrant was supported by probable cause to believe that drug and other evidence of illegal activity was located at Britt's residence. The State contends that the totality of the circumstances contained within the warrant affidavit give rise to a logical nexus between the items sought and Britt's residence.

**DISCUSSION**

The Fourth Amendment protects against unreasonable searches and seizures and provides that warrants cannot issue absent a showing of probable cause supported by oath or affirmation.[1] The Delaware Constitution also safeguards the right to be free from unreasonable searches and seizures and requires that warrants be based upon a sworn statement establishing probable cause.[2]

The Delaware General Assembly codified the requirements for a constitutionally adequate showing of probable cause in 11 *Del. C.* §§ 2306 and 2307 ("Section 2306" or "Section 2307"). Requirements for the content of the affidavit in support of the search warrant are set forth in Section 2306:

> It shall designate the house, place, conveyance or person to be searched and the owner or occupant thereof (if any), and shall describe the things or persons sought as particularly as may be, and shall substantially allege the cause for which the search is made or the offense committed by or in relation to the persons or things searched for, and shall state that the complainant suspects that such persons or things are concealed in the house, place, conveyance or person designated and shall recite the facts upon which such suspicion is founded.[3]

The judicial officer issuing the search warrant must adhere to procedural and substantive requirements contained in Section 2307:

> If the judge, justice of the peace or other magistrate finds that the facts recited in the complaint constitute probable cause for the search, that person may direct a warrant to any proper officer

---

[1] U.S. Const. amend. IV.
[2] Del. Const. art. I, § 6.
[3] 11 *Del. C.* § 2306.

or to any other person by name for service. The warrant shall designate the house, place, conveyance or person to be searched, and shall describe the things or persons sought as particularly as possible.[4]

The specific statutory provisions of Sections 2306 and 2307 were enacted to enhance and elucidate the Federal and State constitutional safeguards against unreasonable searches and seizures.[5]

Delaware courts have interpreted Sections 2306 and 2307 as imposing a four corners test for probable cause.[6] The facts alleged in the affidavit must suffice to allow the issuing magistrate to independently evaluate the existence of probable cause.[7] The face of the affidavit must present adequate facts to allow a reasonable person to conclude that an offense has been committed and that seizable property would be found in a particular place or on a particular person.[8] By requiring all facts relied upon by the magistrate to be contained within the written affidavit, the four corners test insures that the reviewing court can determine the warrant's validity without "reliance upon faded and often confused memories."[9]

The four corners test restricts the scope of a reviewing court's inquiry but does not constrain the court from adopting a flexible, nontechnical approach in evaluating

---

[4] 11 *Del. C.* § 2307.
[5] *State v. Cannon*, 2007 WL 1849022 (Del. Super. June 27, 2007)
[6] *Id*. *See also E.g.*, *Pierson v. State*, 338 A.2d 571, 573-74 (Del. 1975); *State v. Ivins*, 2004 WL 1172351, at *4 (Del. Super. May 21, 2004).
[7] *Jensen v. State*, 482 A.2d 105, 111 (Del. 1984) (citing *Franks v. Delaware*, 438 U.S. 154, 165 (1978)).
[8] *Blount v. State*, 511 A.2d 1030, 1032-33 (Del. 1986); *Ivins*, 2004 WL 1172351, at *4.
[9] *Dorsey v. State*, 761 A.2d 807, 811 (Del. 2000) (quoting *Pierson*, 338 A.2d at 574).

a warrant's validity. The reviewing court's task is to determine whether the warrant application presented the issuing magistrate with a "substantial basis" to conclude that probable cause existed.[10] In making this determination, the reviewing court takes a deferential approach to the magistrate's decision and eschews "a hypertechnical approach to the evaluation of the search warrant affidavit in favor of a common-sense interpretation."[11] The affidavit must be "considered as a whole and not on the basis of separate allegations."[12]

Unlike an arrest warrant, a search warrant is not directed at a person, but rather at the particular place where police have probable cause to believe that evidence is located.[13] Probable cause to search depends upon the existence of a logical nexus between the items sought and the place to be searched.[14] In other words, probable cause to believe that a suspect has committed a crime will support an arrest but not necessarily a search warrant for the suspect's home.[15] Rather, the factual showing necessary to establish probable cause to search a residence is two-fold: first, there must be probable cause that a crime was committed, and second, there must be

---

[10] *Cannon*, 2007 WL 1849022, at *3; *Illinois v. Gates*, 462 U.S. 213, 239 (1983) (citing *Jones v. United States*, 362 U.S. 257, 271 (1960)). *See also Ivins*, 2004 WL 1172351, at *4.

[11] *See Gardner v. State*, 567 A.2d 404, 409 (Del. 1989); *Ivins*, 2004 WL 1172351, at *4.

[12] *Jensen*, 482 A.2d at 111.

[13] *See, e.g., Zurcher v. Stanford Daily*, 436 U.S. 547, 555-56 (1978); *State v. Jones*, 2000 WL 33114361, at *3 (Del. Super. Dec. 5, 2000).

[14] *See, e.g., Dorsey*, 761 A.2d at 811; *Hooks v. State*, 416 A.2d 189, 203 (Del.1980); *State v. Jones*, 1997 WL 528274, at *4 (Del. Super. Aug. 1, 1997).

[15] *See, e.g., United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir.1993).

probable cause to believe that evidence of such crime can be found at the residence.[16] The nexus need not be based on direct observation or facts placing evidence at the location to be searched and may be inferred from the factual circumstances, including "the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences" regarding where a criminal might hide evidence.[17] Requiring this nexus upholds the probable cause requirements of the Federal and State constitutions and properly maintains the distinction between probable cause to arrest and probable cause to search.[18]

## FACTUAL AND PROCEDURAL OVERVIEW

The Affidavit presented to the Magistrate focused on the activities of Antonia Carter ("Carter") and Britt. The Affidavit presented to the Magistrate identified the following facts:

1. During the third week of July 2022, Detective Alexis Schupp of the Wilmington Police Department along with other members of law enforcement met with a past, proven, reliable confidential information ("CI") who stated that a black male named "Sleep" was selling marijuana and MDMA from 834 West 5th Street in Wilmington, Delaware.[19]

---

[16] *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir.1983) (citing *United States v. Harris*, 403 U.S. 573, 584 (1971)).

[17] *See Ivins*, 2004 WL 1172351, at *4 (quoting *United States v. Feliz*, 182 F.3d 82, 88 (1st Cir.1999)).

[18] *See Dorsey*, 761 A.2d at 812-13 ("Probable cause to search and probable cause to arrest are not fungible legal concepts, and each involves a distinctly separate inquiry.").

[19] *See* Exhibit A at 2.

2. The CI provided a phone number and identified "Sleep" as Antonio Carter.[20]

3. During the fourth week of July 2022, Detective Schupp along with other members of law enforcement conducted surveillance on the intersection of West 5th and Adams Street and witnessed Carter enter and exit 834 West 5th Street Several times.[21]

4. Through the CI, Special Agent Haney of the FBI organized a controlled purchase of a marijuana from Carter using the phone number the CI provided to which Carter agreed.[22] Carter was observed exiting 834 West 5th Street, meeting with CI, and handing the CI an item.[23] The CI produced the item Carter handed him to Special Agent Haney, which field tested positive for marijuana.[24]

5. During the third week of August 2022, members of law enforcement successfully organized and conducted a controlled purchase of marijuana from Carter in the same manner as the first.[25]

6. On August 24, 2022, Detective Schupp and members of law enforcement were conducting surveillance on 834 West 5th Street in preparation for the

[20] *Id.*
[21] *Id.* at 3.
[22] *Id.* at 4.
[23] *Id.*
[24] *Id.*
[25] *Id.* at 5.

execution of a search warrant from the residence and observed an individual named Bryant Hawkes conducting what they interpreted, based on their training and experience, to be a hand-to-hand drug transaction.[26] Hawkes was subsequently seen entering and exiting from the residence several times.[27]

7. Shortly thereafter, Carter exited the residence and was taken into custody. On his person, Carter had approximately 5.5 grams of marijuana and two cellular phones.[28]

8. A search warrant was conducted on 834 West 5th Street and law enforcement located the following in Carter's bedroom:[29]

   a. A blue iPhone belonging to Carter;
   b. Paperwork belonging to Carter;
   c. 2,405 bags of suspected heroin between the mattress and box spring;
   d. A pill bottle with Carter's name on it;
   e. A ceramic plate with razor blade, straw, and chunky white substance that field tested positive for cocaine;
   f. Packaging material for narcotics inside of a hamper.

9. In May of 2023, Detective Schupp and members of law enforcement received information from a cooperating defendant ("CD") that "Sleep" a.k.a. Antonio Carter was selling heroin and crack cocaine from 834 West

---

[26] *Id.* at 7.
[27] *Id.*
[28] *Id.* at 8.
[29] *Id.* at 10.

5th Street.[30]

10. During the second week of June 2023, members of law enforcement successfully organized a controlled buy wherein the CD purchased crack cocaine from Carter.[31] This controlled purchase went as follows:[32]

   a. The CD called Carter and ordered a predetermined amount of cocaine;
   b. The CD met with Carter in the front of 834 West 5th Street where an exchange was made;
   c. Carter then directed the CD to the rear yard;
   d. Carter entered the front door of 834 West 5th Street before exiting the rear door and meeting the CD in the rear yard;
   e. Carter then went back into 834 West 5th Street through the rear door and exited the residence through the front door;
   f. Carter made contact with Britt in front of the residence before walking back through the residence, exiting through the rear door, meeting with the CD again, and conducting another exchange.

11. The CD reported to law enforcement that they originally gave Carter the money for crack cocaine in the front of the house, but that Carter then exchanged the original crack cocaine for different crack cocaine in a new amount in the rear yard after Carter met with Britt.[33]

12. Members of law enforcement organized another controlled buy of cocaine from Carter in the second week of June 2023. The second controlled

---

[30] *Id.* at 12.
[31] *Id.* at 13.
[32] *Id.*
[33] *Id.*

9

purchase went as follows:[34]

   a. The CD called Carter and ordered a predetermined amount of cocaine;
   b. The CD and Carter met in front of 834 West 5th Street where they made a quick exchange;
   c. After the exchange, the CD was told to wait in the rear yard;
   d. Carter went back inside of 834 West 5th Street;
   e. A short while later, Britt pulled up and entered 834 West 5th Street before exiting a few minutes later;
   f. Carter then exited the rear door of 834 West 5th Street and met with the CD.

13. The CD reported to law enforcement that he received a partial amount of the purchased crack cocaine initially and, after waiting for an extended period of time, received the full amount of agreed upon cocaine after Carter met with Britt.[35]

14. During the final week of June 2023, members of law enforcement conducted another controlled purchase. The third controlled purchase went as follows:[36]

   a. Carter was observed entering and exiting 834 West 5th Street several times prior to the controlled buy taking place;
   b. The CD placed an order for crack cocaine from Carter over the phone whereupon Carter told the CD to meet him in the rear yard of 834 West 5th Street;
   c. Carter was then observed exiting 834 West 5th Street where he walked a short distance. He was then seen exiting a vehicle as a

---

[34] *Id.* at 14.
[35] *Id.*
[36] *Id.* at 15.

passenger and entering a residence located at 1406 West 6th Street;

    d. After a few minutes, Carter exited 1406 West 6th Street and got back into the same vehicles where he was followed;

    e. That vehicle let Carter out at the intersection of West 6th and Adams Street;

    f. In the 400 block of Adams Street, Carter was observed making an exchange consistent with a hand-to-hand drug transaction before walking directly to the rear yard of 834 West 5th Street and turning over the prearranged amount of crack cocaine to the CD.

15. In the first week of August 2023, members of law enforcement conducted another controlled purchase of crack cocaine from Carter using the CD. The fourth controlled purchase went as follows:[37]

    a. The CD called Carter and ordered a predetermined amount of crack cocaine;

    b. Carter was observed entering the front door of 834 West 5th Street before exiting out of the rear door after several minutes;

    c. Carter then exchanged the agreed upon amount of cocaine with the CD in the rear yard.

16. A few minutes after the fourth controlled purchase, Carter was seen arriving at 1406 West 6th Street before entering the residence where he remained for a short time before exiting.[38]

17. Carter was then followed back to 834 West 5th Street where he was observed on the front steps conducting back-to-back exchanges consistent with hand-to-hand drug transactions with a white female and a black male

---

[37] *Id.* at 17.
[38] *Id.* at 18.

less than a minute apart.

18. Also during the first week of August 2023, Britt was observed exiting from 1406 West 6th Street, walking eastbound on West 6th Street, and turning southbound on North Broom Street before surveillance was lost.[39] Less than two minutes later, Britt was dropped off in a vehicle driven by a black female on the corner of West 6th Street where he was observed walking back into 1406 West 6th Street.[40]

19. In that same week, Britt was observed exiting 1406 West 6th Street, walking southbound on North Broom Street, and meeting with a white female.[41] Britt was seen participating in an exchange consistent with hand-to-hand drug transaction with that female before returning to 1406 West 6th Street and walking into the front door.[42]

20. On August 22, 2023, members of law enforcement executed a search warrant on 1406 West 6th Street and discovered the following:

   a. In the main bedroom:
      i. A Smith & Wesson M&P Shield 9 mm handgun loaded with nine 9mm rounds located on the floor next to the bed in the main bedroom;
      ii. A Glock Model 22 .40 caliber handgun loaded with an extended magazine containing twenty-six rounds of ammunition in the bedroom closet between men's pants on a

---

[39] *Id.* at 19.
[40] *Id.*
[41] *Id.* at 20.
[42] *Id.*

shelf in the closet;

    iii. A second .40 caliber magazine loaded with fifteen rounds on the same shelf as the gun;

b. In the cabinet above the stove:
    i. A digital scale;
    ii. Two bags containing a white chunky substance weighing approximately twenty-one grams that field tested positive for cocaine.

In summary, the facts outlined in the affidavit indicate that there were four (4) separate controlled buys in which either Britt or 1406 West 6th Street were involved.

a. During the first controlled purchase in the second week of June 2023, Antonio Carter does not give the cooperating defendant the appropriate amount of cocaine to complete the deal until after he meets with Britt mid-transaction. Moments after Antonio Carter meets with Britt, he provides the correct amount of cocaine.

b. During the second controlled purchase in the second week of June, Antonio Carter is once again unable to complete the transaction until Britt shows up mid-transaction. Moments after Antonio Carter meets with the Britt, he provides the correct amount of cocaine to the cooperating defendant.

c. The third controlled buy took place in the final week of June 2023. After the cooperating defendant placed an order for cocaine from Antonio Carter, Carter left his residence at 834 West 5th Street, went into 1406 West 6th Street, left after a few minutes, and was observed completing a suspected hand-to-hand drug transaction on his way back to his residence whereupon he immediately provided the cooperating defendant with the agreed upon amount of cocaine.

d. The fourth and final controlled buy occurred during the first week of August 2023. Minutes after Carter provided the cooperating defendant with the predetermined amount of cocaine, he was observed going into 1406 West 6th Street for a few minutes before

exiting and returning to his residence where Carter then sat on his front steps and conducted consecutively suspected hand-to-hand drug transactions.

In three of these four instances, the final exchange of drugs did not occur until after Carter had either met with the Defendant or traveled to, and entered, the Defendant's residence at 1406 West 6th Street.

In addition to those controlled buys Britt was observed leaving his residence under suspicious circumstances. During the first week of August 2023, members of law enforcement conducted surveillance on 1406 West 6th Street. Twice, detectives observed him participate in activity consistent with drug transactions. During the first instance, Britt left his residence only to return less than two minutes later with an unidentified female. During the second instance, Britt was observed meeting with a white female and conducting what detectives based on training and experience determined to be a suspected hand-to-hand drug transaction.

Based on the totality of the information laid out in the affidavit it appears that the relationship between Carter and Britt were working to together to deal drugs and Britt's residence was a place that the drugs were kept. The magistrate had a substantial basis for concluding that probable cause existed and, therefore, the search warrant was legally sufficient. In other words, the issuing magistrate found that there was a fair probability that contraband or evidence of a drug crime would be found at 1406 West 6th Street, Wilmington, Delaware.

Defendant, in support of his motion, relies on two cases *State v. Cannon* and *State v. Ada* to support his position.[43]

In *Cannon*, Wilmington Police received information from a concerned citizen who advised that Cannon lived at 1515 Lancaster Avenue, carried a gun at all times, and sold large quantities of drugs at two separate locations in the City of Wilmington.[44] The following week, Wilmington Police received a "Crime Stoppers" tip that confirmed the concerned citizen's information.[45] Surveillance was conducted on 1515 Lancaster Avenue where Cannon was observed leaving the residence and speaking with three individuals on the corner of 2nd and Rodney Street.[46] The same three individuals were then observed getting into Cannon's vehicle moments later and exited after remaining in the vehicle for three minutes and getting into their own car.[47] Wilmington Police stopped the vehicle that the three individuals had gotten into, seized a small amount of cocaine from these individuals and were informed that they purchased the cocaine from Cannon.[48] Wilmington Police then applied for a warrant to search Cannon's vehicle and home.[49]

Cannon challenged the search warrant for his residence only, and the court

---

[43] *See Cannon*, 2007 WL 1849022; *State v. Jose M. Ada*, 2001 WL 660227 (Del. Super. June 8, 2001).
[44] *Cannon*, 2007 WL 1849022, at *1.
[45] *Id.*
[46] *Id.*
[47] *Id.* at *2.
[48] *Id.*
[49] *Id.*

performed a "four corners" analysis.[50] Ultimately, the court held that the factual showing necessary to establish probable cause to search a residence is two-fold: first, there must be probable cause that a crime was committed, and second, there must be probable cause to believe evidence of that crime can be found at the residence.[51]

The court then went on to enumerate details in the investigation that fell short of establishing probable cause. The court noted that police did not conduct a controlled buy from Cannon's residence. Cannon was never observed leaving his residence with a bag or anything else that would suggest concealment of contraband, police did not question any of the three individuals who met with Cannon, and the evidence stemming from Cannon's interaction with the three individuals did not corroborate the citizen informants' descriptions of Cannon's operation as a trafficker of "large quantities" of drugs.[52]

In the instant case, the deficiencies mentioned by the *Cannon* court are not present. As explained above, there are four separate controlled buys that involved either Britt and/or 1406 West 6th Street. Britt was also observed leaving his residence under suspicious circumstances. During the first week of August 2023, members of law enforcement conducted surveillance on 1406 West 6th Street.

---

[50] *Id.* at *3.
[51] *Id.* at *4.
[52] *Id.* at *5.

Twice, detectives observed him participate in activity consistent with drug transactions.

In *Ada*, Wilmington Police received information from a concerned citizen that an individual was selling illegal drugs from an apartment on Lancaster Avenue.[53] Wilmington Police attempted controlled buys with confidential informants and undercover officers to no avail.[54] During their surveillance, Wilmington Police observed Jose Ada leave the Lancaster Avenue apartment and go to 2724 West 4th Street where he used a key to lock and unlock the door.[55] Police were then informed Probation and Parole that an individual named Richard Deptula was selling drugs for someone who lived in the 2400 block of West 4th Street.[56] Police met with a confidential informant who contacted Deptula and asked him to purchase drugs for them.[57] Deptula took the informant to the Lancaster Avenue apartment and went in while the informant waited in the vehicle.[58] When Deptula emerged, Wilmington Police stopped the vehicle he occupied with the informant and located crack cocaine and heroin.[59] Realizing Ada may have seen the stopped vehicle given the proximity to the Lancaster Avenue apartment, police applied for search warrant for both the

---

[53] *Ada*, 2002 WL 660227 at *1.
[54] *Id.*
[55] *Id. at *2.*
[56] *Id.*
[57] *Id.*
[58] *Id.*
[59] *Id.*

Lancaster Avenue address as well the 2724 West 4th Street address. The court ruled that the search warrant did not provide sufficient probable cause to search 2724 West 4th Street location because police observed no illegal or suspicious activity occurring at that address and the statement that Deptula was possibly selling drugs for someone in that block was insufficient to link Ada to suspected illegal activity occurring at 2724 West 4th Street.[60]

In the instant case, members of law enforcement observed both Britt and Carter coming and going from the 1406 West 6th Street residence. Two of the four controlled buys in this investigation involve Britt. The remaining two controlled buys involved Britt's residence where Carter is observed entering and exiting within minutes of completing multiple suspected hand-to-hand drug transactions and even a confirmed drug transaction in one instance. Additionally, the defendant observed coming and going from his residence while engaging in activity that is consistent with drug transactions. Thus, unlike in *Ada* where absolutely no illegal activity was observed at the 2724 West 4th Street residence, there is clear illegal activity observed at 1406 West 6th Street in this case.

The affidavit submitted to and approved by the Magistrate Judge to search 1406 West 6th Street was sufficient to support a finding that there was probable cause to believe that there was drug and other evidence associated with Britt and his

---

[60] Id. at *5.

residence at 1406 West 6th Street, and there was sufficient evidence in the probable cause affidavit to support a conclusion that there was a logical nexus between the items sought and Britt's residence.

For the stated reasons Defendant's Motion to Suppress is **DENIED**.

**IT IS SO ORDERED** this 16th day of October, 2024.

*/s/ Francis J. Jones, Jr.*

Francis J. Jones Jr., Judge

cc: *Original to Prothonotary*