# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE      )
     )
       v.      )
     )
ANTHONY P. TAYLOR      )
     )    I.D. Nos.    2402010737 and
    and      )                       2402010820
     )
MADELINE SIMMONS,      )
     )
     Codefendants.      )

Submitted: November 1, 2024
Decided: January 2, 2025

## MEMORANDUM OPINION

*Upon Defendant Anthony P. Taylor's Motion to Suppress*

**DENIED**

*Upon Defendant Madeline Simmons's Motion to Suppress*

**DENIED**

Evan D. Sweeney, Deputy Attorney General, Department of Justice, Dover, Delaware, *Attorney for the State*.

Adam Windett, Esquire, Hopkins & Windett, LLC, Dover, Delaware, *Attorney for Defendant Anthony P. Taylor*.

Zachary A. George, Esquire, Hudson, Jones, Jaywork & Fisher, Dover, Delaware, *Attorney for Defendant Madeline Simmons*.

**Primos, J.**

Codefendants Anthony P. Taylor and Madeline Simmons each filed motions to suppress alleging that the magistrate lacked probable cause to issue a search warrant for their shared home. For the reasons that follow, both Defendants' motions are **DENIED**.

**FACTUAL AND PROCEDURAL BACKGROUND[1]**

On February 16, 2024, Detective Logue of the Delaware State Police swore out a search warrant affidavit for 35 Howell Street in Dover, Delaware, where Defendants Anthony Taylor and Madeline Simmons evidently reside (the "Residence"). The affidavit included the following information.

During the first two weeks of January 2024, State Police received information from "a past proven and reliable confidential informant" that an individual named Anthony Taylor was "selling large amounts of marijuana and MDMA pills from his residence" at 35 Howell Street.[2] The informant identified Taylor from a DELJIS photograph.[3] Police then determined that the vehicles in the driveway of the Residence were registered to Taylor and Simmons.[4]

During the last two weeks of January, police surveillance observed FedEx deliver a package to the Residence.[5] A "computer inquiry" revealed that the package did not indicate the sender or recipient, and bore only a barcode.[6] Detective Logue stated that he was "aware through training and experience that drug dealers will commonly ship and receive drugs [in such packages] in order to avoid law enforcement."[7]

---

[1] These footnotes cite to the affidavit at issue in this case, attached as exhibits "A" and "1" of Taylor's and Simmons's respective motions, with "Affidavit ¶ __". The addendum thereto is cited herein as "Affidavit Addendum."
[2] Affidavit ¶ 5.
[3] *Id.* ¶ 6.
[4] *Id.* ¶ 7.
[5] *Id.* ¶ 14.
[6] *Id.*
[7] *Id.*

During this same period, the informant allegedly had "a brief conversation" with Taylor in the driveway of the Residence.[8] The informant later told the police that he or she observed a firearm in Taylor's waistband.[9] Through a CJIS/NCIC inquiry, police determined that Defendant Taylor had multiple felony convictions and could not legally possess either a firearm or ammunition.[10]

Also within the second half of January, police observed the first of two suspected drug transactions involving Defendants. An individual pulled her car into the Residence's driveway but did not leave the vehicle.[11] Taylor exited the Residence with a "light blue object" in his right hand and passed it through the driver's side window.[12] The driver passed something back.[13] Taylor then re-entered the Residence.[14] According to Detective Logue, based on his knowledge and experience, this was a hand-to-hand drug transaction.[15] Officers stopped the vehicle after it left the Residence, searched it, and recovered a light blue package that was labeled "Snow balls" and contained 3.5 grams of marijuana.[16] The driver said that she had "recently stopped at her friend 'Anthony's' house."[17]

Officers next observed a suspected transaction during the first two weeks of February.[18] On an otherwise unspecified date, a pickup truck pulled into Defendants' driveway.[19] Simmons left the Residence and approached the driver's

---

[8] *Id.* ¶ 15. It is unclear from the affidavit whether this encounter was observed by law enforcement or merely reported by the informant. *Id.*

[9] *Id.*

[10] *Id.* ¶ 3.

[11] *Id.* ¶ 8.

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.* ¶¶ 8–11. Detective Logue personally weighed and used a chemical test kit to confirm the composition of the marijuana. *Id.* ¶ 11.

[17] *Id.* ¶ 10.

[18] *Id.* ¶ 12.

[19] *Id.*

window.[20]  Officers apparently did not witness any handoff.  Detective Logue instead averred that "[b]ased on previous intel provided by [the informant], the previous surveillance operation that resulted in the recovery of marijuana and your Affiant's training knowledge and experience, your Affiant was confident that he just observed an illicit drug transaction[.]"[21]  Officers stopped the pickup and recovered an unspecified quantity of marijuana.[22]

A magistrate granted the warrant on February 16, 2024, the same date Detective Logue swore out his affidavit.  The warrant sought, among other things, marijuana, drug paraphernalia, indicia of occupancy, records related to purchasing or distributing marijuana, and "any firearm or deadly weapon in close proximity to marijuana and or [sic] paraphernalia or any other controlled substance[.]"[23]

On August 8, 2024, Taylor filed a motion to suppress evidence gathered pursuant to the February 16 warrant.  Simmons filed a motion to suppress the same evidence on August 28, 2024.  In Simmons's motion, and at oral argument on November 1, 2024, counsel made clear that they adopted one another's arguments in whole.  For the purposes of this Opinion, therefore, Defendants collectively raise the following arguments:  (1) the informant in this case was not past-proven reliable; (2) the informant's tip was not sufficiently corroborated to provide probable cause; (3) the information contained in the affidavit was stale; (4) the probable cause standard for this case must be reexamined in light of Delaware's decriminalization of marijuana; and (5) there was an insufficient nexus between the suspected drug activity and Defendants' residence to support a warrant for that residence.

---

[20] *Id.*

[21] *Id.*

[22] *Id.* ¶ 13.  Detective Logue indicated that the marijuana was "weighed and tested" but did not specify what the weight was.  *Id.*

[23] Affidavit Addendum.

4

## DISCUSSION

On a motion to suppress the proceeds of a search warrant, the movant has the burden of proving,[24] by a preponderance of the evidence, that the warrant was issued unlawfully.[25] A magistrate's finding of probable cause to support a warrant is entitled to great deference by reviewing courts.[26] The reviewing court should not invalidate a warrant on the basis of a "hypertechnical, rather than common sense, interpretation of the warrant affidavit."[27] The court need only determine that, given the totality of the circumstances[28] described within the four corners of the affidavit,[29] the magistrate had a "substantial basis for concluding that probable cause existed."[30]

When, as here, an informant's tip is involved, the court should consider "the reliability of the informant, the details contained in the informant's tip, and the degree to which the tip is corroborated by independent police surveillance and information."[31]

Probable cause to search a particular place exists when "there is a fair probability that contraband or evidence of a crime will be found[.]"[32] This requires a "logical

---

[24] *State v. McCants*, 2019 WL 1503937, at *2 (Del. Super. Apr. 4, 2019) (citing *State v. Sisson* (*Sisson I*), 883 A.2d 868, 877 (Del. Super. 2005), *aff'd*, 903 A.2d 288 (Del. 2006)); *State v. Cannon*, 2007 WL 1849022, at *2 (Del. Super. June 27, 2007) (citing *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978)); *State v. Dollard*, 788 A.2d 1283, 1286 (Del. Super. 2001); *State v. Bien-Aime*, 1993 WL 138719, at *3 (Del. Super. Mar. 17, 1993)).

[25] *McCants*, 2019 WL 1503937, at *2 (citing *State v. Iverson*, 2011 WL 1205242, at *3 (Del. Super. Mar. 31, 2011)); *Cannon*, 2007 WL 1849022, at *2 (citing *Dollard*, 788 A.2d at 1286; *Bien-Aime*, 1993 WL 138719, at *3).

[26] *State v. Holden*, 60 A.3d 1110, 1114 (Del. 2013) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)); *Cooper v. State*, 228 A.3d 399, 404 (Del. 2020) (citing *Jensen v. State*, 482 A.2d 105, 111 (Del. 1984)).

[27] *Cooper*, 228 A.3d at 404 (quoting *Jensen*, 482 A.2d at 111).

[28] *Id.* (citing *LeGrande v. State*, 947 A.2d 1103, 1108 (Del. 2008)).

[29] *Sisson I*, 883 A.2d at 877; *Valentine v. State*, 207 A.3d 566, 570–71 (Del. 2019).

[30] *Sisson v. State* (*Sisson II*), 903 A.2d 288, 296 (Del. 2006) (citation omitted).

[31] *Cooper*, 228 A.3d at 405 (quoting *Holden*, 60 A.3d at 1114).

[32] *Id.* (quoting *Stones v. State*, 676 A.2d 907, 1996 WL 145775, at *2 (Del. Feb. 23, 1996) (ORDER)).

nexus between the items sought and the place to be searched."[33]

Here, a common-sense review of the warrant affidavit shows that the magistrate had a substantial basis to conclude that probable cause existed. While the magistrate could not credit the informant as past-proven reliable, some indicia of the informant's reliability were present, and independent police work provided a sufficient basis for finding probable cause. Delaware's decriminalization of marijuana does not require police or magistrates to afford suspects the benefit of the doubt. Finally, there was a sufficient nexus between Defendants' suspected criminality and the Residence to support a warrant for that address.

## I. THOUGH THE INFORMANT COULD NOT BE CREDITED AS PAST-PROVEN RELIABLE, THIS DID NOT PRECLUDE A FINDING OF PROBABLE CAUSE.

When a search is prompted by a "tip," the existence of probable cause depends on the reliability of the tipster,[34] the basis of the tipster's knowledge,[35] and the extent to which the tip has been corroborated.[36] The reliability of the tipster "determines how much corroboration, if any, is necessary to meet the probable cause standard[.]"[37] Some tipsters, e.g., non-anonymous citizens without ties to crime, are so reliable that their information requires no additional corroboration.[38] An informant is also considered more reliable if his or her previous tips have proven reliable.[39] Consistent

---

[33] *Cooper*, 228 A.3d at 405.

[34] *Valentine*, 207 A.3d at 572 (citing *Brown v. State*, 897 A.2d 748, 751 (Del. 2006)).

[35] *Id.* (citing *Holden*, 60 A.3d at 1114).

[36] *Id.* (citing *LeGrande*, 947 A.2d at 1108).

[37] *Sisson I*, 833 A.2d at 879.

[38] *Id.* at 879–80 (collecting cases); *Brown*, 897 A.2d at 751 ("Where the informant is a known, law abiding citizen reporting a crime, the informant is considered presumptively reliable, because the informant has no connection to the criminal world and no reason to fabricate the story.") (citing *Bailey v. State*, 440 A.2d 997, 999 (Del. 1982)).

[39] *See generally Morgan v. State*, 962 A.2d 248 (Del. 2008) (considering the CI's "past-proven" reliability as a factor for finding probable cause); *but see Valentine*, 207 A.3d at 573 n.33 (noting that the decision in *Morgan* "turned more on the informant's accurate prediction of the defendant's future movements than on his reliability based on past performance," which was attested by the affiant without support).

with the "four-corners" rule, a warrant affidavit must provide some indication of how a confidential informant has proven reliable for a magistrate to credit him or her as such.[40] A conclusory representation by the affiant is insufficient.[41]

In this case, the affidavit provided no basis for the conclusion that the confidential informant was past-proven reliable. Under the Delaware Supreme Court's 2019 *Valentine v. State* decision, therefore, the magistrate could not credit the informant as past-proven reliable.[42] This, however, does not conclude the Court's inquiry. Even if nothing is known about the reliability of an informant, the informant's tip can form the basis for probable cause if sufficiently corroborated.[43]

---

[40] *Valentine*, 207 A.3d at 572–73.

[41] *Id.*

[42] *Id.*; *accord State v. Clifton*, 2024 WL 3201166, at *5–6 (Del. Super. June 27, 2024).

[43] *Valentine*, 207 A.3d at 573 ("[O]ur conclusion that the affidavit was insufficient to establish the informant's credibility on the basis of past performance does not end our inquiry. We must also consider whether other circumstances lend credence to the informant's report sufficient to support a probable cause finding for some other reason."); *Cooper*, 228 A.3d at 405; *Tolson v. State*, 900 A.2d 639, 643 (Del. 2006) (en banc) ("If the informant's tip can be corroborated, the tip may establish probable cause, even where nothing is known about the informant's credibility.") (citation omitted); *accord State v. Dunning*, 2019 WL 77145, at *4–7 (Del. Super. Jan. 2, 2019) (though the State did not "alleg[e] in its response or in the Affidavit that the Informant was past proven reliable," the tip was nonetheless reliable given the totality of the circumstances); *cf. Loper v. State*, 298 A.3d 665, 2023 WL 3743102, at *3 (Del. May 31, 2023) (ORDER) (trial counsel did not render ineffective assistance by failing to move to suppress, where the identification of an informant as "past proven" was conclusory under *Valentine* but counsel's decision was justified by a later controlled purchase at the defendant's apartment).

**II.** **THE INFORMANT'S TIP WAS SUFFICIENTLY CORROBORATED BY POLICE SURVEILLANCE WHEN TAKEN IN CONJUNCTION WITH OTHER EVIDENCE.**

The informant's tip in this case was not so thoroughly corroborated that it could, in and of itself, support a finding of probable cause. The tip was, however, sufficiently corroborated that, *in conjunction* with the police's direct observations of potential criminality, the magistrate had a substantial basis to so find.

Delaware Courts have historically distinguished between two forms of corroboration: corroboration of a defendant's identity and corroboration of criminality.[44] The latter, but not the former, supports probable cause.[45] "[A]llegations that establish the basis of the informant's knowledge of the events or conduct he has reported to law enforcement can be 'highly relevant in determining the value of his report.'"[46] Anonymous tips concerning "concealed possessory crimes" are subject to greater scrutiny in this regard than crimes "open to public observation."[47] Also considered are whether the informant "is exposed to a risk of retaliation by not concealing his identity,"[48] whether the informant personally observed the things reported,[49] whether the informant did so recently, and whether the tip accurately predicted subsequent events.[50]

Some factors counsel against giving weight to the informant's tip in this case. The police's efforts to corroborate it either related to Defendants' identities or only

---

[44] *LeGrande*, 947 A.2d at 1111; *McKinney v. State*, 107 A.3d 1045, 1049 (Del. 2014) (en banc).
[45] *LeGrande*, 947 A.2d at 1111.
[46] *Valentine*, 207 A.3d at 573 (quoting *Gates*, 462 U.S. at 230).
[47] *LeGrande v. State*, 947 A.2d at 1111 n.34 (Del. 2008) (citing *Bloomingdale v. State*, 842 A.2d 1212 (Del. 2004)).
[48] *McKinney*, 107 A.3d at 1048 (citing *United States v. Valentine*, 232 F.3d 350, 354 (3d Cir. 2000)).
[49] *Valentine*, 207 A.3d at 574 (citing *Gates*, 462 U.S. at 234).
[50] *Dunning*, 2019 WL 77145, at *4 (citing *United States v. Torres*, 534 F.3d 207, 211 (3d Cir. 2008)); *Tolson*, 900 A.2d at 643 (an informant's predictions of the defendant's actions, including traveling to a location per the informant's instructions, arriving as a passenger, and parking at a different location before walking to the meeting place, supported probable cause).

produced evidence of small-scale transactions.[51]  Since the informant stated that Taylor was "selling large amounts of marijuana and MDMA," this evidence only partially corroborated the informant's tip.[52]  Further, it is unclear from the affidavit how the informant knew that the Defendants were dealing marijuana or dealing it from the Residence.[53]  Furthermore, the affidavit indicates that the informant was able to identify Taylor from a photograph[54]—the sort of open and obvious information that cannot evince knowledge of concealed criminality.[55]  Similarly,

---

[51] *Compare* Affidavit ¶ 11 (3.5 grams of marijuana), *with Cannon*, 2007 WL 1849022, at *5 (holding that 0.1 grams of cocaine did not corroborate tip that the defendant was trafficking large quantities); *Clifton*, 2024 WL 3201166 at *5 n.50 (0.998 grams of suspected heroin/fentanyl recovered from the defendant was insufficient "to form a reasonable belief that [the defendant] was a drug dealer" as alleged by an informant because the quantity was not inconsistent with personal use).

[52] The Court is cognizant that some of its decisions—notably *Cannon* and *Clifton*—could be interpreted to stand for the proposition that large quantities of drugs must be discovered before a tip such as that at issue here can be considered corroborated at all.  *See Clifton*, 2024 WL 3201166, at *5 ("to the extent any criminal activity was corroborated, [the defendant] was found to possess a small amount of drugs . . . .  This is insufficient to establish the CS's credibility."); *id.* at *5 n.50; *Cannon*, 2007 WL 18492022, at *5 ("The evidence stemming from [the defendant's] interaction . . . did not corroborate the citizen informants' description of [the defendant] as a trafficker of 'large quantities of drugs[.]'").  To the extent that these cases contradict the Court's holding in this case, they are unpersuasive.  The Delaware Supreme Court has made clear that corroboration is not a binary condition.  Rather, the Court should consider "the *degree* to which the tip is corroborated."  *Cooper*, 228 A.3d at 405 (quoting *Holden*, 60 A.3d at 1114).  In other words, a tip may be fully corroborated, partially corroborated, or wholly uncorroborated.  In this case, even if the informant were mistaken about the amount, the fact that he or she appeared to have been correct that Taylor was dealing some quantity of marijuana bolstered his or her credibility.  While this corroboration might not have rendered the tip sufficiently credible to support probable cause on its own, the tip was nonetheless one factor that the magistrate could consider as part of his totality-of-the-circumstances analysis.  Further, it is not clear from the facts in the affidavit that the informant *was* mistaken about the quantities in question.  It is entirely feasible that police surveillance did not detect every drug transaction that Defendants engaged in during the period of surveillance (e.g., because it was not maintained continuously, or because some transactions took place in private).  It is also possible that Taylor previously dealt large quantities but curtailed his business in early 2024.  The affidavit does not contain support for any of these hypotheticals, but it does not rule them out.  In other words, the affidavit did not *discredit* the informant's tip.

[53] Affidavit ¶¶ 5–6.

[54] *Id.* ¶ 6.

[55] *LeGrande*, 947 A.2d at 1110 ("[T]he single confirmation of readily observable facts does not

though police used Taylor's vehicle to confirm that he lived in the home the informant indicated, this corroboration is of little probative value standing alone. Any one of Taylor's neighbors could attest to this fact, but such knowledge would do little if anything to indicate that they knew he was a drug dealer.[56]

Other factors favor the informant's credibility, however. The drug the police confirmed Defendants likely sold—marijuana—was one of the two the informant identified.[57] If "an informant is right about some things, he is more probably right about other facts."[58] Though police observation did not fully corroborate the informant's report of "large quantities" of illicit drugs being sold, it is significant that police observed two suspected sales, which suggested that Taylor and Simmons were in the business of drug dealing.[59] Furthermore, the affidavit indicated that the informant personally observed Taylor carrying a firearm in the driveway of the Residence, which, if believed, signaled a reliable basis of knowledge.[60] Finally, the informant's identity was apparently known to law enforcement, which would open the informant up to repercussions if the tips turned out to be false—and the informant

---

enhance the reliability of an anonymous tip to the level required for a finding of reasonable suspicion.") (quoting *Flonnory v. State*, 805 A.2d 854, 858 (Del. 2001) (confirmation of tip that the defendant was "scrunched low" in parked vehicle did not give rise to reasonable suspicion that the defendant possessed an "illegal substance" as alleged)); *State v. Bordley*, 2017 WL 2972174, at *3 (Del. Super. July 11, 2017) (ORDER) (finding that CI's identification of the make and color of the defendant's vehicle and connection to trailer park did not support reasonable suspicion because this information was "discernable to any member of the public who had seen [the defendant] driving his car in the area.").

[56] *See Ivins*, 2004 WL 1172351, at *5 ("[T]he information provided by the confidential informants about [the defendant's] house, vehicles and apparent lack of work is the type of information that any person living on [his] street could have provided. It does not, as such, corroborate the information provided by the confidential informants.").

[57] Affidavit at ¶ 5.

[58] *Gates*, 462 U.S. at 244 (quoting *Spinelli v. United States*, 393 U.S. 410, 427 (1969) (White, J., concurring)).

[59] *See* Part III, *infra*.

[60] Affidavit at ¶ 15; *Valentine*, 207 A.3d at 574 ("The most straightforward way to an establish an informant's basis of knowledge is by alleging that the informant is providing first-hand information.") (citing *Gates*, 462 U.S. at 234).

could have known that his or her identity would be revealed to Defendants by the inclusion of identifying details in the affidavit (e.g., that the informant spoke with Taylor in the latter's driveway).

While some factors thus weigh in favor, and some against, finding the tip was reliable, an exclusive focus on the informant's tip would obscure the fact that police surveillance provided an independent reason to conclude that Defendants were engaging in criminality. The existence of a tip should not weigh *against* a finding of probable cause. Even if the informant were wrong or lying, this would not be proof of Defendants' innocence absent extraordinary circumstances. Thus, a conclusion that the drug amounts apparently transacted fell short of those indicated in the tip, and that probable cause therefore did not exist, would be both illogical and hypertechnical.

Setting the informant's tip to one side, the evidence in this case closely parallels that in *State v. Johns*,[61] where this Court denied the defendant's motion to suppress notwithstanding the contested reliability of tips from anonymous informants. In *Johns*,

> [d]uring the first week of surveillance, police observed a vehicle park in front of [the defendant's] home. The vehicle's driver briefly met with an individual in the residence doorway before returning to his vehicle and driving away. When police stopped the vehicle moments later, the driver revealed he had just purchased illegal drugs from a friend who cuts hair at [the defendant's address].
>
> The next week, officers observed an individual go into [the defendant's] residence for an hour before leaving in a car with expired temporary registration tags. Police stopped the car after witnessing a traffic violation and identified the driver as Charles Webster. Mr. Webster exhibited nervous behavior throughout the stop, including heavy and exaggerated breathing, and refused to respond to police questions and commands. When police asked him to exit his vehicle, Mr. Webster told the officers he did not want to be searched and sped

---

[61] 2023 WL 3750432 (Del. Super. May 31, 2023).

11

off. Based on this experience, police believed Mr. Webster and [the defendant] had recently engaged in a drug transaction.[62]

After reviewing this evidence, "the Court [was] convinced the surveillance and traffic stops *alone* were sufficient to furnish the officers with probable cause to search [the defendant's] residence, with or without the anonymous tips outlined in the warrant.[63]

As in *Johns*, police in this case stopped a car shortly after it left Defendants' home; the officers found drugs; and police tied one of the Defendants to the drugs (here, because the driver identified Taylor as a "friend," and because the drugs were in a distinctive light-blue package consistent with the one Taylor handed over). Not long thereafter, police stopped another vehicle leaving Defendants' home and again found the same drug. Though possessing the drug was not self-evidently illegal, as in *Johns* (as discussed more fully in Part IV of this Opinion), these two incidents, combined with the suspicious package received at Defendants' address and the affiant's representation that the package was consistent with drug trafficking, was sufficient for the magistrate to reasonably conclude that criminality was probably afoot.

## III. THE INFORMATION UNDERLYING THE AFFIDAVIT WAS NOT STALE.

The magistrate was not required to treat the evidence in this case as stale, even though it concerned narcotics, information about which becomes stale more quickly than does evidence of other crimes. The magistrate could reasonably have found sufficient evidence of an ongoing criminal enterprise to bolster any older information in the affidavit. Since the indicated criminal enterprise was operated out of Defendants' home, it logically followed that any diminution of Defendants' suspected drug stash at the Residence would be offset by a flow of replacement drugs

---

[62] *Id.* at *1.
[63] *Id.* at *3 (emphasis in original).

to facilitate future sales. Even if a criminal enterprise were not ongoing, the evidence would not have been stale, as the second alleged transaction took place at most sixteen days before the warrant issued.

The Delaware Supreme Court has held that judicial officers should "examine all the relevant facts and circumstances in a practical and flexible manner" rather than "simply counting the number of days between the occurrence of the facts relied upon and the issuance of the affidavit."[64] "The question of staleness . . . rests primarily upon the nature of the criminal activity alleged[.]"[65] Information is more likely stale when the evidence sought is "subject to deterioration or destruction," "located in a place subject to indiscriminate access,"[66] or, as drugs, "consumable, or highly incriminating, and thus less likely to remain in one location."[67] On the other hand, when an affidavit indicates that criminal activity is ongoing and that evidence is either likely to remain in one place or to be replenished (as with a dealer's inventory of narcotics), staleness becomes less of an issue.[68] Further, at least one decision of this Court suggests that the standard for evidence of ongoing criminal activity is lower than that required for a finding of probable cause.[69]

Here, the informant's tip, the two suspected drug transactions, the suspicious package, and the informant's purported observation of a gun in Taylor's waistband

---

[64] *Sisson II*, 903 A.2d at 297 (quoting *Pierson v. State*, 338 A.2d 571, 573) (Del. 1975)) (internal quotation omitted).

[65] *Jensen*, 482 A.2d at 111; *see also State v. Smith*, 2004 WL 2744878, at *3 (Del. Super. Nov. 12, 2004) (information concerning child pornography was not stale because "collectors . . . tend to retain this material.").

[66] *Windsor v. State*, 676 A.2d 909, 1996 WL 145800, at *1 (Del. Mar. 8, 1996) (ORDER).

[67] *Jensen*, 482 A.2d at 112 (citing *United States v. Beltempo*, 675 F.2d 472, 478 (2d Cir. 1982); *United States v. Steeves*, 525F.2d 33, 38 (8th Cir. 1975)).

[68] *Gardner v. State*, 567 A.2d 404, 410–11 (Del. 1989); *Hopkins v. State*, 501 A.2d 774, 776 (Del. 1985); *Ivins*, 2004 WL 1172351, at *3.

[69] *Ivins*, 2004 WL 1172351, at *3, *5, *7–9 (finding that the tips at issue were insufficiently reliable to satisfy probable cause, but that "[g]iven the continuous nature of the alleged unlawful activity . . . [i.e.] the possession and sale of controlled substances, the passage of time [was] not significant.").

support a reasonable inference of an ongoing criminal enterprise. While any one of these facts might not have been sufficient on its own, they, in combination and over a span of weeks, made it more likely that the Defendants would replace any drugs sold or used.

Even in the absence of an ongoing criminal enterprise, the evidence was not likely stale. At the risk of reducing the analysis to "counting the number of days," no more than sixteen days elapsed between the last suspected drug exchange observed and the warrant application.[70] Persuasively, in *Johns*, this Court held that a tip about narcotics was not stale as a matter of law because the police initiated surveillance within a month thereafter, even though there was no evidence of an ongoing criminal enterprise.[71] Recognizing that there is no bright line rule, and taking into account the nature of drug evidence, the evidence cited by the affiant was not stale, and could therefore be considered by the magistrate. The Court is reluctant to discourage or punish law enforcement for taking the time to gather more evidence and present the strongest possible warrant affidavit.[72] Further bolstering this decision is the fact that there was at least some evidence of a gun crime not subject to the same accelerated staleness timeline.[73]

---

[70] *See* Affidavit ¶ 12 (noting that the second incident took place in the first half of February).

[71] *Johns*, 2023 WL 3750432, at *2. *See also Prince v. State*, 920 A.2d 400, 403 (Del. 2007) (evidence was not stale when six days elapsed between a heroin sale and the warrant application); *Windsor*, 1996 WL 145800 (nine-day delay in searching defendant's home for marijuana did not render information stale, when defendant was in custody; it was a "private home," and the drugs "would not dissipate or become contaminated" in the interim).

[72] *See Hopkins*, 501 A.2d at 776 (endorsing the police's decision "to enlarge the time frame for receiving reports of suspicious conduct of a repetitive nature to present a strong case for the grant of a search warrant.").

[73] *See Jensen*, 482 A.2d at 112 (27-day delay did not invalidate the warrant in a rape case, where police sought "a nylon stocking, a revolver, various articles of men's clothing, a road map and body hair from the defendant."); *cf. Woody v. State*, 219 A.3d 993, 2019 WL 4644049, at *4 (Del. Sept. 23, 2019) (ORDER) (intervening four months did not render evidence stale, where law enforcement sought valuable electronics that were not consumable and were the sorts of possessions people "would likely continue to maintain."). One reason evidence of illegal guns is less susceptible to staleness is that individuals are likely to retain firearms for self-defense

14

## IV. DELAWARE'S LEGALIZATION OF MARIJUANA DID NOT REQUIRE THAT THE MAGISTRATE IGNORE THE EVIDENCE OF POTENTIAL DRUG DEALING.

Though the General Assembly has significantly restructured the state's handling of marijuana sales and possession,[74] these legal changes are not dispositive of Defendants' motions. It remains illegal for non-licensed persons, such as Defendants, to deal in controlled substances.[75] Though possession, use, and purchase of "personal use quantities" of marijuana is generally no longer subject to criminal penalty under Delaware law,[76] it remains a crime to provide others with marijuana for "remuneration," or through various mechanisms intended to conceal the remuneration, such as giving a pretextual "gift" that is "contingent upon a separate reciprocal transaction[.]"[77] In other words, only licensees may legally sell marijuana in the state of Delaware.

While the legalization of marijuana may make the exchange of personal-use quantities of the drug legally ambiguous unless there is evidence of some sort of payment, this does not mean that observing such exchanges is irrelevant to probable cause, or that law enforcement and magistrates are obligated to ignore them.[78] "That

---

purposes. *Cf. State v. Holton*, 2011 WL 4638781, at *6 (Del. Super. Sept. 22, 2011) ("Because guns are so freely moveable, it is reasonable to think the handgun could be in either [the defendant's] car or residence. More to the point, if [the defendant] used the handgun for personal protection, it is even more likely that he would have brought the handgun into his home, and thus, the police had probable cause to search [the defendant's] residence.").

[74] *See generally* 84 Del. Laws ch. 15 (2023).

[75] *See* 16 *Del. C.* §§ 4751C, 4752, 4753, 4754.

[76] 16 *Del. C.* § 4764A(b)(2).

[77] 16 *Del. C.* § 4764A(b)(1) (legalizing "adult sharing"); § 4764A(a) (excluding certain activities from "adult sharing," including providing marijuana in conjunction with a "reciprocal transaction"); § 4764A(c) (stating that "selling . . . marijuana without a license" "remain[s] unlawful and an offense under the law of this State[.]").

[78] *See People v. Zuniga*, 372 P.3d 1052, 1058–59 (Colo. 2016), *abrogated by People v. McKnight*, 446 P.3d 397 (Colo. 2019) (despite legalization of possession of one ounce of marijuana, alert of dog trained on marijuana and other narcotics could contribute to probable cause determination); *State v. Green*, 697 S.W.3d 634, 643–44 (Tenn. 2024) (even though the state had legalized hemp and a drug dog could not differentiate between it and illegal marijuana, the dog alert could still be considered in a totality of the circumstances analysis) (quoting *Zuniga*, 372 P.3d at 1058); *State v.*

hypothetically innocent explanations may exist for facts learned during an investigation does not preclude a finding of probable cause."[79]  Moreover, even observed legal activity can be the basis for probable cause if that activity suggests criminality in context.[80]  Possession of legal (or arguably legal) intoxicants can still be evidence of a crime.[81]  Here, there is circumstantial evidence that both Defendants provided third parties with some quantity of marijuana—in Defendant Taylor's case through an observed reciprocal exchange.  While the evidence in the warrant affidavit could have an innocent explanation (several of which Defendants have propounded),[82] the magistrate was not obligated to assume such explanations.

_____

*Togerson*, 995 N.W.2d 164, 174 (Minn. 2023) (though the state had a medical exemption and had legalized hemp, and though a smell of marijuana did not provide probable cause to search a vehicle on its own, such a smell is "one of the circumstances in the totality of circumstances analysis that should be considered[.]"); *Robinson v. State*, 152 A.3d 661, 681–82 (Md. 2017) (decriminalization of marijuana did not render the possession thereof legal, and text and history indicated that the General Assembly did not intend to preclude a vehicle search predicated on a smell of marijuana— but even assuming possession were legal, the drug would remain contraband so long as it was "unlawful to import, export, [or] produce[.]") (quoting *Contraband*, Black's Law Dictionary (10th Ed. 2014)) (emphasis omitted).

[79] *Lefebvre v. State*, 19 A.3d 287, 293 (Del. 2011) (citing *State v. Maxwell*, 624 A.2d 926, 929 (Del. 1993)); *accord Stafford v. State*, 59 A.3d 1223, 1229 (Del. 2012) (officer had probable cause to search a vehicle on suspicion of criminal impersonation when a passenger lacked identification and the officer was unable to find his purported name on DELJIS, even though not all residents are in that system).

[80] *See, e.g., Tolson*, 900 A.2d at 643 (predictions of the defendant's actions, including traveling to a location per the informant's instructions, arriving as a passenger, and parking at a different location before walking to meeting place, supported probable cause); *Gates*, 462 U.S. at 243–46 (details in informant's letter were corroborated where defendant, largely consistent with predictions therein, flew to Florida, and then immediately drove back to Illinois, which was "suggestive of a pre-arranged drug run").

[81] *See State v. Salasky*, 2013 WL 5487363, at *8 (Del. Super. Sept. 26, 2013) (police could seize bath salts and Xanax from the defendant's home, notwithstanding his argument that the former was legal, and that there was no evidence the latter was purchased illegally, where there was evidence that these substances contributed to the defendant's "bizarre and extremely violent" behavior, including multiple burglaries and assaults).

[82] Defense counsel have suggested, for instance, that the reciprocity of the first exchange could be explained by reimbursement, which they distinguish from the statutorily-proscribed "remuneration" and "reciprocal transaction."  *See* 21 *Del. C.* § 4764A(a), (b).  The Court need not examine whether reimbursement for the cost of marijuana is legal in Delaware to resolve this case, as Defendants' motions fail irrespective of whether their interpretation of the statute is

The Delaware Supreme Court's treatment of the smell of intoxicants supports the view that observed marijuana exchanges can contribute to probable cause post-legalization. The Court has made clear that the smell of marijuana does not, standing alone, give officers probable cause to arrest a vehicle's passenger and search her person.[83] This is the same way that the Court treats the smell of alcohol on a driver's breath.[84] However, with both intoxicants, the Court has permitted odor to be one of multiple factors contributing to a finding of probable cause.[85] Specifically, the Supreme Court has found that a vehicle's odor can help form probable cause to believe the driver consumed the drug in a moving vehicle, which remains a

---

correct. At oral argument, counsel also suggested that the unmarked package could have contained some other sensitive material, such as medication. This, too, is merely one innocent explanation that the magistrate was not obligated to assume.

[83] *Juliano v. State* (*Juliano II*), 260 A.3d 619, 630–35 (Del. 2021) (analogizing the odor of marijuana to the smell of alcohol on a driver's breath and demonstrating that the officer lacked probable cause to suspect the defendant of any specific marijuana offense, such as possession under the age of 21 or use or consumption in a moving vehicle).

[84] *Lefebvre*, 19 A.3d at 293, 295.

[85] *Id.* at 295 (the odor of alcohol and traffic violation, combined with admission to having had a drink an hour and a half prior and flushed face gave trooper probable cause to arrest defendant for DUI even after defendant performed well on a field sobriety test); *Milner v. State*, 314 A.3d 687, 2024 WL 853694, at *5 (Del. Feb. 28, 2024) (ORDER) (*Juliano II* was an unusual case in that it turned on odor of marijuana alone and the defendant was only one of the vehicle's occupants; there was thus no error in denying a motion to suppress where the defendant was the "driver and sole occupant," the defendant attributed the odor of marijuana to a cigar, and the defendant only lowered his vehicle window slightly when the officer approached him); *Pollard v. State*, 284 A.3d 41, 47 (Del. 2022) ("the odor of marijuana emanating from the vehicle, the marijuana remnants in the console and on the floor of the vehicle, and a larger nugget of marijuana in the console" established probable cause); *accord State v. Brown*, 287 A.3d 1222, 1239 (Del. Super. 2023) (probable cause existed to search vehicle where the officer "detected the odor of marijuana" and the defendant admitted to smoking marijuana in the same clothes that day and in the car "a long time ago"). This understanding is consistent with the holding in *State v. Jernigan*, in which this Court found that law enforcement's failure to discover the defendant's status as a medical marijuana card holder rendered the warrantless search of his car unreasonable. *See generally State v. Jernigan*, 2019 WL 2480808 (Del. Super. June 13, 2019). First, the odor of raw (unburnt) marijuana was the only basis for the search in *Jernigan*. *Id.* at *5 (therefore distinguishing *Law v. State*, 185 A.3d 692, 2018 WL 2024868 (Del. May 17, 2018) (ORDER)). Second, *Jernigan*'s rationale is only applicable when the defendant holds such a card, and that status is readily discoverable. *Juliano v. State* (*Juliano I*), 254 A.3d 369, 391 (Del. 2020).

misdemeanor under 16 *Del. C.* § 4764(d).[86]

A hand-to-hand exchange of marijuana could certainly be consistent with legal activity, in the same way that the odor of marijuana from a vehicle could be consistent with a lawful act (smoking outside the vehicle, with the odor clinging to the driver's clothes, or smoking in the vehicle while it is stopped). These innocent explanations do not render the observations of police officers irrelevant. Admittedly, an ambiguous fact may contribute less to probable cause than an unambiguous one,[87] or contribute to probable cause in a narrower set of circumstances than pre-legalization (e.g., an odor of burnt marijuana on an individual pedestrian would not support probable cause to believe the pedestrian had smoked in a moving vehicle to the same extent as if the individual were currently driving). However, as the existing probable cause framework allows for these sorts of distinctions, legalization does not justify creating a new test or bright line for probable cause. The "totality of the circumstances" test is sufficiently expansive to account for changes in the law.

## V. THERE WAS A SUFFICIENT NEXUS BETWEEN THE ALLEGED CRIMES AND THE DEFENDANTS' HOME TO SUPPORT A FINDING OF PROBABLE CAUSE.

Probable cause to search a particular place exists when "there is a fair probability that contraband or evidence of a crime will be found" at that place.[88] This requires a "logical nexus between the items sought and the place to be searched."[89] The nexus

---

[86] *Pollard*, 284 A.3d at 47.

[87] *See Green*, 697 S.W3d at 643 ("While it is true that the legalization of hemp 'may add a level of ambiguity to a [dog sniff's] probative value in a probable cause determination, [sic] . . . it does not destroy the fact's usefulness outright and require it to be disregarded.'") (quoting *Zuniga*, 372 P.3d at 1058) (alterations in original); *id.* at 644 ("A positive alert from a canine trained to detect cannabis, methamphetamine, cocaine, and heroin 'still give[s] rise to a high probability that a controlled substance is in the car.'") (quoting *United States v. Deluca*, 2022 WL 3451394, at *5 (10th Cir. Aug. 18, 2022)) (alterations in original).

[88] *Sisson II*, 903 A.2d at 296 (quoting *Stones*, 1996 WL 145775, at *2).

[89] *Cooper*, 228 A.3d at 405.

between the crime and the location to be searched need not be based on direct observation or facts, but may instead be inferred from circumstantial evidence.[90]

The Court has historically been reluctant to find that evidence of a drug crime automatically confers probable cause to search a defendant's home.[91] However, the Court has been more willing to find probable cause when the defendant travels to or from his or her home immediately before or after a suspected drug sale,[92] and the Supreme Court has found that illegal activity occurring at an address creates a sufficient nexus to justify a search of that address.[93]

This Court's decision to suppress evidence in *State v. Cannon*[94] is factually distinguishable. In *Cannon*, a "concerned citizen" and a Crime Stoppers tip identified the defendant as "selling large quantities of drugs at two locations," neither of which was his home.[95] Further, the Court noted that the defendant did not travel directly from home to the confirmed drug deal at issue, but instead first met with another group, from whom he could have purchased the drugs.[96] No tipster indicated that the defendant was dealing from his residence,[97] and there was no

---

[90] *State v. Hyland*, 2020 WL 1847475, at *2 (Del. Super. Apr. 9, 2020) (citing *State v. Aguilar*, 2016 WL 4394617, at *2 (Del. Super. Aug. 15, 2016)); *Cannon*, 2007 WL 1849022, at *4 (citing *Ivins*, 2004 WL 1172351, at *4).

[91] *Cannon*, 2007 WL 1849022, at *4; *Clifton*, 2024 WL 3201166, at *5.

[92] *Aguilar*, 2016 WL 4394617, at *2–3; *State v. Lindsey*, 2011 WL 2651808, at *1–2 (Del. Super. June 29, 2011); *cf. generally Hyland*, 2020 WL 1847475 (finding a sufficient nexus where the defendant was developed as a suspect in a home invasion; surveillance showed a vehicle similar to his van parked near the site of the crime; that vehicle picked someone up near the fence line of the victim's property and near a point that evidence was discarded two days later; and the affiant attested that home invaders "often" kept fruits and instrumentalities of their offense in their homes and vehicles).

[93] *Bradley v. State*, 204 A.3d 112, 2019 WL 446548, at *5 (Del. Feb. 4, 2019) (ORDER).

[94] 2007 WL 1849022.

[95] *Id.* at *1.

[96] *Id.* at *5 (additionally noting that the defendant "was never observed leaving or entering his residence with a bag or anything else that would suggest he was bringing evidence or contraband to or from his home.").

[97] *Id.* ("[N]either of the citizen informants . . . indicated that [the defendant] was using his residence to deal drugs or to store drugs, drug paraphernalia, or any other evidence of drug transactions.")

evidence of drug shipments or other "unusual traffic at the residence."[98]  The court intimated that any of these factors, or even "direct or indirect evidence that a defendant traveled immediately to his home after engaging in illegal activity might be sufficient to establish probable cause that evidence or contraband are located in the residence."[99]

In contrast to *Cannon*, the magistrate in this case was presented with evidence that both Defendants dealt drugs from the Residence, that there was unusual traffic on at least two occasions, and that one suspected drug shipment was delivered there. This case is therefore more analogous to *State v. Aguilar* and *State v. Lindsey*, in which the Court found a sufficient nexus because the defendant drove directly from his home to a controlled buy and returned home immediately thereafter.[100]  This case

---

(citation omitted).

[98] *Id.* (citing *Gardner*, 567 A.2d at 410 (in which the Court found that a drug shipment in close temporal proximity to the search created a sufficient nexus)).

[99] *Id.* at *6 & n.50 (quoting *United States v. Burton*, 288 F.3d 91, 104 (3d Cir. 2002) ("[The] inference [that drug dealers often keep evidence of their transactions at home] is much stronger when the home is the first place a drug dealer proceeds following such a transaction.") (alterations in original).

[100] *Aguilar*, 2016 WL 4394617, at *1–3; *Lindsey*, 2011 WL 2651808, at *2 (finding a sufficient nexus because "[o]n the first occasion the defendant was seen returning to the residence after delivering marijuana to the informant from the Cadillac [and] . . . [o]n the second occasion the defendant was seen driving from the residence directly to the predetermined location in the same Cadillac."). This case is similarly distinguishable from *Clifton*. In *Clifton*, the defendant and two associates drove away from her home in a minivan and were stopped by police after traveling several blocks. *Clifton*, 2024 WL 3201166, at *2. The defendant consented to a search of her purse, which turned out to contain approximately 0.1 grams of heroin or fentanyl, split between two labeled bags. *Id.* This case can be distinguished from *Clifton* in several areas. First, there is here a more direct link between the residence and the alleged crimes because officers observed suspected transactions at the house itself. Second, in *Clifton*, though the defendant and her cohort left her home and traveled just a few blocks before they were stopped, it was possible that the drugs were brought by one of the passengers, which made it less likely that they were stored at the residence, as the Court found relevant in *Cannon*. *Cannon*, 2007 WL 1849022, at *5. Finally, and most importantly, in *Clifton* it was unclear that the defendant was engaged in drug dealing at all. *Clifton*, 2024 WL 3201166, *5 n.50 ("The affidavit . . . fails to present sufficient facts to form a reasonable belief that [the defendant] was a drug dealer."). Here, the affidavit presented circumstantial evidence tying both Defendants to such activity.

could also be analogized to the Delaware Supreme Court's decision in *Bradley v. State*.[101] In *Bradley*, the Court also distinguished *Cannon*, because the affidavit "provide[d] . . . visual observations of illegal or suspicious activity connecting the alleged criminal activity with the place to be searched."[102] Specifically, the affidavit noted that (1) the defendant "illegally purchas[ed] a firearm at the garage and (2) subjects enter[ed] and exit[ed] the garage within a few minutes" while the defendant was inside the garage.[103] Here, (1) an informant claimed that Taylor was selling illegal drugs from the Residence; and (2) subjects arrived at the Residence and departed within a few minutes after suspected hand-to-hand drug transactions.

In light of these considerations, the affidavit in this case set forth a sufficient logical nexus between the items sought and Defendants' home.

---

[101] 2019 WL 446548.

[102] *Id.* at *5.

[103] *Id.* The evidence of an illegal purchase came from the statement of a past-proven confidential informant, while the observations of comings and goings came from police surveillance. *Id.* at *1.

## CONCLUSION

In sum, the magistrate had a substantial basis for concluding that probable cause existed to search Defendants' home.  For this reason, Defendant Anthony P. Taylor's Motion to Suppress is **DENIED**.  Defendant Madeline Simmons' Motion to Suppress is **DENIED** for the same reasons.

 **IT IS SO ORDERED.**

           _____
           Noel Eason Primos, Judge

NEP/tls
*Via Email*
oc:  Prothonotary
cc:  Counsel of Record